Petit Anse Company v. Commissioner.
Petit Anse Co. v. Commissioner
Docket No. 675.
United States Tax Court
1944 Tax Ct. Memo LEXIS 68; 3 T.C.M. (CCH) 1183; T.C.M. (RIA) 44370; October 27, 1944
*68 Joseph S. Clark, Esq., 1500 Walnut St. Bldg., Philadelphia, Pa., and Frank McLoughin, Esq., 720 Hibernia Bldg., New Orleans, La., for the petitioner. William G. Ruymann, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined the following deficiencies in income and excess profits taxes against the petitioner: Excess
Year
Income Tax
Profits Tax
1937
$4,253.85
$4,285.40
1938
5,410.88
3,961.77
1939
3,183.27
2,743.70
The issues presented are whether the respondent erred (1) in disallowing deductions of $34,577.11, $32,661.88 and $23,878.14 taken by the petitioner in 1937, 1938 and 1939, respectively, as interest paid on certain income debentures issued by it, and (2) in determining that the petitioner was entitled to depletion allowances for each of the years 1937, 1938 and 1939 computed at the rate of 13.333 cents per ton of salt mined. Issue (2) was raised by respondent in an amended answer. Findings of Fact The petitioner is a Delaware corporation, organized on May 15, 1924, and filed its income tax returns for the years 1937 through 1939, which were made on the cash receipts basis, with the Collector *69 for the District of Louisiana. In 1812, John C. Marsh was the owner of an island now known as Avery Island. It is situated in the southern portion of Iberia Parish, Louisiana, about ten miles from New Iberia. The island is a high tract of land rising out of the sea marsh, roughly oval in form, its greatest diameter being about one and one-half miles. It contains about 5,300 acres of land, of which about 2,300 acres are high land and the balance is low land. Prior to 1800, the island was known to contain brine springs, and by 1817 Marsh had established a salt business built on the recovery of salt from the water. Competition from imported salt later destroyed the business. At the outbreak of the Civil War, Judge Daniel Dudley Avery, a son-in-law of Marsh, was the owner of the island. Due to the scarcity of salt, salt operations were re-established. In May 1862, massive rock salt was discovered, and from then until the destruction of the works by Federal forces in April 1863, salt was quarried from large open pits. After the close of the Civil War, salt operations were resumed on the property and were continued more or less regularly by different operators until 1896. Judge Avery died *70 in 1876. About or before that time, the ownership of Avery Island passed to his children, in whose hands and in the hands of their fammlies such ownership, either directly or indirectly, has remained at all times material hereto. In 1898 the owners of Avery Island were Dudley Avery, Mary Eliza McIlhenny, Sarah Avery Leeds and Margaret Avery Johnston, children of Judge Avery. In that year Avery Rock Salt Mining Company was organized under the laws of West Virginia, to carry on salt mining operations on Avery Island. On November 1, 1898, the owners of the island entered into a lease agreement with Avery Rock Salt Mining Company whereby they granted to that company, for a period of ten years from July 1, 1898 with the privilege of renewal for an additional period of fifteen years, the right to mine salt from under 2, 240 acres of the high land on the island, the surface use of 50 acres surrounding the mine shaft and the terminus of the railroad which runs to the mine, with use of the houses and improvements appurtenant to the mining enterprise and a merchandise store building near the railroad. The consideration for the agreement was an annual rental or royalty of $10,000, payable monthly, *71 50 percent of the profits from a merchandise business to be conducted in the store building, and the payment of taxes against the leased premises. Upon termination of the agreement, all improvements placed upon the property by the lessee were to become the property of the lessors. Desiring to separate the agricultural interests in Avery Island from the salt interests, the above-mentioned owners of the island caused the Avery Planting & Improvement Company, a Louisiana corporation, to be formed on July 3, 1903. At that time they transferred to the Avery Planting & Improvement Company, sometimes hereafter referred to as the Planting Company, their interests in the island, except that they reserved from the transfer their interests in the salt and the 50-acre tract surrounding the mine shaft, and their interest in the homestead on the island, together with a tract of land of not more than 50 acres surrounding it. In connection with the transfer, the Planting Company issued 1,000 shares of its capital stock, of a par value of $100 each, 250 shares being issued with respect to the interest of each of the transferors. The charter of the Planting Company contained a prohibition on the sale *72 or transfer of stock in the company to others than stockholders, unless first offered for sale to the stockholders. On August 15, 1905, Mary Eliza McIlhenny transferred her one-fourth interest in the salt on Avery Island to E. McIlhenny's Son, a Louisiana corporation formed on that date. Thereafter by another transfer the one-fourth interest she had in the 50-acre tract surrounding the mine shaft was transferred to E. McIlhenny's Son. On November 4, 1910, Dudley Avery, Sarah Avery Leeds and Margaret Avery Johnston, the owners of the remaining undivided three-fourths interest in the salt on Avery Island and the 50-acre tract surrounding the mine shaft organized Avery Company, a Louisiana corporation, and on November 12, 1910, transferred their said interest to that company. The authorized capital stock of the company consisted of 1,000 shares, of a par value of $100 each, and the charter, like that of the Planting Company, contained a prohibition on the sale or transfer of stock in the company to others than stockholders, unless first offered for sale to the stockholders. For the interest transferred to Avery Company, each of the transferors received 250 shares of stock. The remaining *73 250 shares were reserved for issuance to E. McIlhenny's Sons upon the transfer by it to Avery Company of the one-fourth interest previously owned by Mary Eliza McIlhenny. Such one-fourth interest was so transferred on August 10, 1921. On March 1, 1916, Avery Company, owning three-fourths of the salt deposit on Avery Island, and E. McIlhenny's Son, owning one-fourth, entered into a lease agreement with Avery Rock Salt Mining Company which canceled the lease of November 1, 1898, referred to above, and gave the company a new lease for a period of 35 years from March 1, 1916. The new lease fixed the minimum annual rental at $20,000, payable monthly, plus a percentage of the earned profits, payable quarterly, and provided that onehalf of the profits from the merchandise business conducted by the company should be paid to the lessors. It was further provided that the company should keep the premises in good repair, pay all taxes thereon and that upon termination of the lease all improvements placed upon the premises by the company should become the property of the lessors. The petitioner was formed as a result of a reorganization of the Avery Company, and for the purpose of taking over *74 the interests of that company in Avery Island. On September 26, 1924, the interest of Avery Company in the island was transferred to petitioner, and on that date Avery Company was dissolved. The capital stock of petitioner, as authorized at the time of formation, consisted of 5,000 shares, of no par value, but before their issuance the charter was amended to provide an authorization of 15,000 shares. The 15,000 shares were issued to the stockholders of Avery Company in exchange for their stock in that company, on the basis of 15 shares in petitioner for each share of stock in Avery Company. On January 1, 1925, petitioner and Avery Rock Salt Mining Company entered into a new lease, as was intended by the plan of reorganization of Avery Company. The new lease was for a term of 26 years from its date. It provided for an annual rental of $20,000, payable monthly, and a percentage of the gross receipts, payable quarterly, after certain deductions for operating and selling expenses, upkeep and taxes. All improvements placed on the premises by the company were to become the property of the lessor upon termination of the lease. In 1930 the petitioner was the owner of the salt deposit on *75 Avery Island and the 50 acres surrounding the mine shaft, while Avery Planting & Improvement Company was the owner of the remaining land and rights on the island. The petitioner was engaged in no activity other than that of holding title to the property owned by it, which was then under lease for a term ending in 1951. Its only income was the rental from the lease. In the earlier years of its existence, the Planting Company had engaged in the production and sale of cane syrup but, due to losses, that activity was discontinued, and later it was decided by the stockholders that the company would not engage in any business activity that might result in losses. In 1930 and for some years prior thereto, its only activity consisted of holding its property, leasing the property for mineral and oil exploration and for trapping and grazing purposes. In the fall of 1930, the reorganization, recapitalization and combination of petitioner and the Planting Company was considered, and in January 1931, the directors of petitioner adopted a plan which provided generally as follows: 1. Petitioner would issue $1,000,000 of 8 percent income debenture bonds and would offer said bonds to its stockholders *76 pro rata, upon surrender by them in exchange thereof of 9,000 shares of its stock, each stockholder to surrender nine-fifteenths of the stock held by him or her respectively. 2. Petitioner would offer pro rata to the stockholders of Planting Company, in exchange for 1,000 shares they held in that company, 4,000 shares of the said 9,000 shares of stock in petitioner which were to be surrendered. 3. If the plan should be approved, the charter of petitioner would be amended to prohibit it from engaging in any active business involving liability and to restrict its corporate purpose to the holding, care, upkeep and leasing of its properties. 4. After execution of the plan, the "capitalization" of petitioner would be 8 percent income debenture bonds, $1,000,000; shares of stock (no par value), 10,000. The plan was adopted and thereafter carried out. On November 21, 1931, petitioner filed amendments to its charter, reducing its authorized capital stock from 15,000 shares, of no par value, to 10,000 shares, of no par value; prohibiting it from engaging in any active business involving liability; and restricting its activities to the maintaining and leasing of its properties. The debentures *77 were dated November 1, 1931, and were designated "Eight Per Cent. Registered Non-Cumulative Fifty Year Income Gold Debenture", with a stated due date of November 1, 1981. They recited that they were issued under and subject to an indenture of even date, entered into between the petitioner and Joseph S. Clark, Jr., and Frank McLoughlin, as trustees. The indenture provided that beginning tonFebruary 1, 1932, and out of petitioner's surplus net income for the fourth quarter of the calendar year 1931, and thereafter quarterly on May 1, August 1 and November 1, out of the petitioner's surplus net income for corresponding quarters, the directors of the petitioner might pay interest on the debentures to the extent such surplus net income should be sufficient for the purpose, and, if not sufficient, then pro rata. Although the interest periods were named and the particular surplus net income out of which the interest at said periods might be paid, the directors had the right to distribute at any time, on account of any quarterly installment of interest payable in any calendar year, any surplus net income of that quarter, or of any other quarter of such calendar year, available for the purpose; *78 but the total amounts distributed as interest at or for the four quarterly interest periods in any calendar year were not to exceed 8 percent. The term "surplus net income" was defined in the indenture as follows: "* * * the surplus remaining after deducting from the gross earnings or income of the Company all of its operating expenses, including maintenance, repairs, renewals, replacements, insurance, losses, damage claims and proper charges in respect of depreciation and obsolescence and all sums paid or reserved for taxes, assessments or other governmental charges and such sums paid or reserved for alterations, additions and improvements as in the judgment of said Board may be deemed necessary or desirable. * * *" Interest upon the debentures was not to be cumulative. No interest was to be due and payable unless declared by the board of directors out of the petitioner's surplus net income, and their determination as to whether there was any surplus net income in any year and the amount thereof was binding upon the petitioner and the debenture-holders. When the surplus net income for a given year is sufficient to pay in full the interest for that year and the full amount of 8 *79 percent is not paid for that year, the directors may at any time after such year use such surplus net income to pay in full the unpaid portion of the interest for such given year. By giving 60 days notice, the petitioner has the right to redeem any or all of the debentures on any interest paying date, prior to their maturity on November 1, 1981. The particular debenture or debentures to be redeemed are to be determined by the petitioner's board of directors, in its discretion, at any regular or special meeting. In event of default by the petitioner in the payment of interest or of principal, or in the performance of any of the provisions of the indenture, and the default has continued for a period of 60 days without being remedied, the trustees may, and upon request of the holders of 60 percent in amount of debentures outstanding shall, declare the principal of all the debentures due and payable, if it is not already due and payable. The holders of 60 percent in amount of the debentures have the right to waive any event of default and its consequences, and may rescind any action of the trustees in declaring the principal of the debentures due and payable. All rights of action in *80 respect of the debentures are vested exclusively in the trustees, and no debenture-holder has any right to bring any action, at law or in equity, upon any debenture or growing out of any of the provisions thereof or of the indenture or for the enforcement of the indenture, unless the trustees have refused and neglected to institute proper proceedings for a period of 60 days after having been requested to do so by the holders of 60 percent in amount of the debentures outstanding. The indenture was not to be recorded or registered in any public office. It recited that the only parties interested in the petitioner, as debenture owners, were descendants of Judge Avery, that it was their intention that no party should become the owner of any of the debentures except descendants of Judge Avery, and that each debenture-holder agreed that before selling his debentures to another, other than a debenture-holder, he would first offer them to the petitioner, who would have a 30-day option to purchase them at the same price at which a bona fide offer had been received from outside sources. The petitioner and all of its property was to be liable for the payment of the debentures. Debenture-holders, *81 as such, were not given any right to participate in the management of the business. The following is a statement showing the names of the stockholders of the petitioner and of the Planting Company at the time of the reorganization, the number of shares held by each in petitioner prior to reorganization, the number of shares of stock in and par value of debentures of petitioner, as reorganized, received in exchange for shares held in petitioner prior to reorganization, the number of shares held in the Planting Company and the number of shares in petitioner, as reorganized, received in exchange for shares in the Planting Company: Shares in,as
and debentures
of, petitioner
as reorganized
Shares held in
received in
Shares held
petitioner
exchange for shares
in the
prior to
held in petitioner
Planting
Name
reorganization
prior to reorganization
Company
Shares
Debentures
Kate Avery Clark
2,859
1,143+
$ 190,600+
201
S. Coleman Avery
1,020
408 68,000 28
Mrs. Daniel D. Avery
1,470
588 98,000 98
Catherine B. Avery
275
110 18,300 17
Louise Avery McLoughlin
275
110 18,300 17
Margaret Avery Ringle
275
110 18,300 17
Edith Duncan Avery
275
110 18,300 17
Sarah Avery Johnson
325
130 21,600 17
Estate of John Leeds Avery
1,868
747+
124,500+
124
Edward Avery McIlhenny
1,254
501+
83,600+
83
John Avery McIlhenny
1,049
419+
69,900+
69
Paul Avery McIlhenny
1,186
474+
79,000+
79
Sarah Avery McIlhenny
1,019
407+
67,900+
70
Rufus Avery McIlhenny
940
376 62,600 102
Mary M. Bradford
910
363+
60,600+
61
* Unissued
5 500 Total
15,000
6,000 [6,001]
$1,000,000 1,000
*82 Shares in petitioner as
reorganized
received in
exchange
for shares
in the
Planting Company
Kate Avery Clark
804
S. Coleman Avery
112
Mrs. Daniel D. Avery
392
Catherine B. Avery
68
Louise Avery McLoughlin
68
Margaret Avery Ringle
68
Edith Duncan Avery
68
Sarah Avery Johnson
68
Estate of John Leeds Avery
496
Edward Avery McIlhenny
332
John Avery McIlhenny
276
Paul Avery McIlhenny
316
Sarah Avery McIlhenny
280
Rufus Avery McIlhenny
408
Mary M. Bradford
244
* Unissued
Total
4,000
Although the trust indenture was executed and the debentures thereunder were issued as of November 1, 1931, the balance sheets of the petitioner at December 31, 1931, and December 31, 1932, appearing as parts of its 1931 and 1932 income tax returns, indicate that the issuance of the debentures under the above plan was not reflected on petitioner's books until sometime in 1932, and except *83 for land valued at $62,500, buildings at $1,200, and $489.16 in cash received in July 1932 upon liquidation of the Planting Company, no new assets were received upon the issuance of the debentures, petitioner's assets merely being written up as good will, in the amount of $932,010.64. Petitioner's balance sheet for December 31, 1931, referred to above, was as follows: ASSETS
Cash
$ 886.95
Accounts receivable
193.64
Salt deposit, Avery Island
$550,000.00
Less: Reserve depletion
68,021.23
481,978.77
Deficit
29,989.71
$513,049.07
LIABILITIES AND CAPITAL
Capital stock (common)
$513,049.07
$513,049.07
Following is the balance sheet at December 31, 1932, reflecting the assets received in dissolution of Planting Company, the debentures outstanding and the write-up of assets: ASSETS
Cash
$ 2,424.13
Land
62,500.00
Buildings
1,200.00
Salt deposit, avery
Island
$550,000.00
Less: Reserve for
depletion
80,342.45
469,657.55
Good will
932,010.64
Deficit
32,947.85
$1,500,740.17
LIABILITIES AND CAPITAL
Notes payable
$ 4,000.00
Bonds and notes (not secured by
mortgage)
1,000,000.00
Unpaid capital depletion
6.16
Capital stock (common)
500,734.01
$1,500,740.17
*84 From the creation of the petitioner through 1927, the $20,000 fixed annual rental, payable monthly, under the salt mining lease and the quarterly rentals based on production were paid directly by the mining company to the stockholders of the petitioner, in proportion to their stockholdings. During 1928, and up to November 1, 1931, the effective date of the reorganization, the said rentals were first received by petitioner and by it paid over to the stockholders in the same proportions. After the effective date of the reorganization, and on November 25, 1931, the directors of petitioner adopted a resolution authorizing the treasurer, until further action by the board, to pay on the first of each month to the debenture-holders 1/6 of one percent, for each such month. The effect of this resolution was to prescribe that the $20,000 fixed annual rental, receivable monthly, under the salt mining lease should be distributed to exactly the same individuals and in exactly the same amounts as had been payable to them prior to November 1, 1931. A similar resolution was adopted on January 22, 1932. On the same date, a resolution was also adopted authorizing the treasurer to pay to the debenture-holders *85 "interest" of 1/2 of one percent from the "receipts" of the petitioner for the months of November and December 1931, and to distribute the "receipts" of the petitioner for the month of October 1931 pursuant to the practice which had prevailed prior to November 1. On January 25, 1932, a resolution was adopted authorizing the treasurer to distribute on account of "interest" on the debentures, 1 1/2 percent to the holders of record as of February 1, 1932, out of the "surplus net income" for the fourth quarter of the calendar year 1931. So far as this record shows, the only other resolution ever adopted authorizing any payment on account of "interest" on debentures, or providing for any payment or distribution by petitioner to the debenture-holders or stockholders, was adopted on January 24, 1933, and authorized the treasurer to distribute on account of "interest" on the debentures 9/25 of one percent to the holders of record as of February 1, 1933, out of the "surplus net income" for the fourth quarter of the calendar year 1932. The payments actually made by the petitioner's treasurer, whether from "receipts" or out of "surplus net income", after November 1, 1931, were to exactly the *86 same individuals and in the same proportions as before November 1, 1931, except that for the months of January through October 1931 distributions allocable to E. A. McIlhenny, John A. McIlhenny, Paul A. McIlhenny and Rufus A. McIlhenny, to the extent of $27.27 each, apparently had been paid to Sarah A. McIlhenny. Thereafter and through the taxable years, except for some small changes resulting from shifts of debentures between various members of the Avery family, so-called, the distributions or payments to the debenture-holders and/or stockholders of the petitioner continued to be made in the same proportions as before the reorganization. The result was that except for the small amounts needed and required by the petitioner to cover its expenses, all of the moneys received under the salt mining lease, plus, in the later years, small amounts received for sand and gravel and trapping rights, were divided proportionately among the debenture-holders and/or stockholders. Beginning with 1927 and continuing through the years here under consideration, the petitioner computed the allowance claimed for the depletion of its salt deposits at the rate of 13.333 cents for each ton of salt mined. *87 No reserve for the depletion of the salt properties was set up or maintained, all of the rentals under the salt mining lease, except small amounts expended from the quarterly rentals for corporate purposes, being distributed to the individuals who held petitioner's stock and debentures. Shortly after the end of each year, the total amount of depletion for the year was computed at the rate stated above and the amount so determined was then apportioned between the stock or the debentures outstanding. The apportionment for each of the taxable years here under consideration appears to have been made on the basis of stock outstanding, although in some years, according to petitioner's president, the apportionment was based on outsanding debentures. Each debenture-holder was then advised by letter of his pro rata share of the depletion sustained during the prior year and that of the total of the payments or distributions which the debenture-holder had received during such year, an amount equal to his pro rata share of depletion should be treated as a return of capital and the remainder thereof as interest on the debentures. That part of the distributions thus allocated to depletion was charged *88 by petitioner to its capital stock account, and no part was at any time applied as being payment on the principal amount of the debentures outstanding. So far as disclosed by the record, the only formal action taken by petitioner's directors with respect to depletion was the adoption of a resolution on March 9, 1935, reciting that depletion charges of $12,315.06, $12,643.87 and $12,628.07 for the years 1932, 1933 and 1934, respectively, had been distributed to "Bond Holders" without formal resolution of the board, and ratifying and approving those distributions. Following is a statement of the net income reported by petitioner and by the Planting Company on their respective income tax returns for the years 1927 to 1931, inclusive: Planting
Year
Petitioner
Company
Total
1927
$40,921.93
Loss $1,881.85
$39,040.08
1928
31,599.00
Loss 1,205.20
30,393.80
1929
70,491.82
3,497.15
73,988.97
1930
90,611.89
3,084.91
93,696.80
1931
* 60,292.51
3.17
60,295.68
The following is a statement of the net income reported by petitioner on *89 its income tax returns for the years 1932 to 1939, inclusive, after deduction of the indicated amounts as interest paid on its debentures: Amount deducted
as interest
Net Income
Paid on
Year
Reported
Debentures
1932
$4,276.96
$14,338.54
1933
Loss 1,346.59
18,616.12
1934
3,963.95
28,790.83
1935
2,670.44
24,672.69
1936
Loss 1,171.59
20,642.95
1937
1,989.99
34,577.11
1938
Loss   147.11
32,661.88
1939
Loss 1,013.94
23,878.14
The petitioner has maintained for each year a sheet showing the monthly payments or distributions to its stockholders and bondholders, the total of such payments or distribution for the year, and the parts thereof which stockholders or bondholders were to consider as having been paid out of the depletion reserve and therefore a return of capital and the part to be treated by them as interest on debentures. Total amounts paid or distributed by petitioner to its stockholders, and/or bondholders, the amounts indicated as depletion distributions and as interest on bonds, shown by such records for the years 1932 to 1939, inclusive, were as follows: Total Pay-
ments or
* Depletion
Distribu-
or Capital
Year
tions
Return
Interest
1932
$26,653.60
$11,458.74
Not tabulated
1933
31,253.67
12,637.55
$18,616.12
1934
41,412.59
Not tabulated
Not tabulated
1935
37,186.18
12,513.49
24,672.69
1936
34,149.55
13,506.60
20,642.95
1937
50,473.92
15,896.81
34,577.11
1938
46,979.15
14,317.27
32,661.88
1939
40,238.38
16,360.24
23,878.14
*90 The deductions of $34,577.11, $32,661.88 and $23,878.14 taken by the petitioner in its income tax returns for 1937, 1938 and 1939, respectively, as interest paid on its debentures in those years, were disallowed by the respondent in determining the deficiencies involved herein. In its income tax returns for 1937, 1938 and 1939, the petitioner took deductions for salt depletion of $15,262.61, $13,910.11 and $16,370.06, respectively, which were based on salt mined of 114,470 tons, 104,325.826 tons and 122,775.430 tons, respectively, or at a depletion rate of 13.333 cents per ton. In determining the deficiencies in controversy, the respondent allowed the deductions thus taken. The depletion rate of 13.333 cents per ton had been agreed upon between petitioner and respondent, and has been used by petitioner in computing its salt depletion allowances for the years 1927 through 1942. Said depletion rate was computed on a recoverable salt reserve on March 1, 1913, of 3,750,000 tons, with a basis or value on that date of $500,000. Operation and development of the mine prior to *91 December 31, 1930, disclosed a commercially recoverable salt reserve at the end of 1930 of 19,886,992 tons. Depletion allowed for the period prior to 1927 amounted to $182,258.56, and for the years 1927 through 1936, amounted to $139,632.91, or total depletion allowed to the end of 1936, of $321,891.47, thus leaving on December 31, 1936, $178,108.53 as the unrecovered portion of the value of the reserve on March 1, 1913, of $500,000. Salt removed during the years 1931 through 1936 totaled 568,082 tons, leaving an unrecovered salt reserve at the end of 1936 of 19,318,910 tons. Opinion The question here is whether such parts of the amounts distributed or paid periodically during the taxable years by petitioner to holders of its stock and "Income Gold Debentures" as exceeded each such person's pro rata share of petitioner's depletion allowance was interest, deductible under section 23 (b) of the Revenue Act of 1936 and the corresponding sections of the Revenue Act of 1939 and the Internal Revenue Code, as the petitioner contends, or constituted distributions of corporate profits, and were not therefore deductible, as the respondent contends. Looking past the form and terminology *92 of the debentures to the rights conferred upon the holders, the debentures differ little, if any, from any non-voting, non-cumulative issue of preferred stock. They do in words state that the petitioner promises to pay a specified sum on the first day of November, 1981, but, as the court said in , the fixing of such a maturity or retirement date "may be considered * * * but is not conclusive" of a creditor relationship. See also , affd., ; ; ; and , wherein securities having fixed maturity or redemption dates were held not to evidence indebtedness. It is also true in the instant case that the holders of the debentures were, according to terms used, entitled to "interest" up to 8 percent, but it is further noted that such payments to the holders were to be *93 made only out of "surplus net income", and it was specifically prescribed that no interest should "be or become due and payable on this Debenture unless declared by the Board of Directors of the Company out of such surplus net income * * *." The indenture under which the debentures were issued contains some elaborate provisions for the enforcement of rights thereunder in the event of default. Prior to 1981, however, there could be no default unless the board of directors had first declared or authorized a payment of "interest" out of surplus net income and such declared amount remained unpaid. There was also a provision to the effect that the petitioner and all of its property should be liable for the payment of the said debentures, but the indenture contained a further provision providing that the indenture should not be recorded, a provision most unusual for an indenture covering the issuance of formal evidence of indebtedness. Considering the actualities of the relationship between petitioner and its debenture-holders, as evidenced by the provisions of the debentures and the indenture under which they were issued, we think it was one of proprietorship rather than that of debtor-creditor. *94 The conduct of the petitioner, its stockholders and its debenture-holders since the reorganization of petitioner in 1931 is in our opinion also of significance. The facts show that prior to the reorganization all of the rentals received by petitioner under the salt mining lease, except such small amounts as might be needed for administrative expenses, were passed on by the petitioner to its stockholders without any reservation for depletion or other purposes. This practice continued unchanged after the reorganization and the issuance of the securities here in question. It is true that in the two years immediately following petitioner's directors did adopt several resolutions dealing with the distribution of the said rentals as "interest", and one of these resolutions provided for the distribution of the $20,000 fixed annual rental, receivable monthly, until further action by the board. Except for that resolution, neither the petitioner, its stockholders, its officers nor its directors took any action with respect to the distribution of any rentals, "receipts" or "surplus net income" received by petitioner after 1932. Regardless of that fact, however, someone acting for the petitioner, *95 ostensibly the treasurer, continued to make distribution of the said rentals under the salt mining lease, as had been done before the reorganization in 1931, and the amounts received from the sale of sand and gravel and the granting of trapping rights. Except for the resolution of January 22, 1932, authorizing distribution monthly of the $20,000 fixed annual rental under the salt mining lease as "interest", there was never any resolution declaring the nature or character of any of the distributions made after 1932; the payments were received by the debenture-holders, who were likewise the stockholders of the petitioner, in a lump sum, and at the end of each year these individuals were notified by the president of the petitioner that certain parts of the total distributions which had been made represented depletion distributions or return of capital and that the other parts, or the remainder, represented interest on the debentures. From the facts, it thus appears that the formalities prescribed by the indentures and the indenture were not indulged in, and it is certain from the record here that the amounts claimed here as interest paid do not even represent amounts which were declared *96 or might have been declared by petitioner's directors as "interest" from "surplus net income", but, to the contrary, represent the excess of the total amount received by each debenture-holder or stockholder, in any given year, over and above his or her pro rata share in the depletion allowance of the petitioner for such year. Such conduct of the petitioner and its officers, and the acquiescence and the participation therein of the debenture-holders and stock-holders, tend to show that the purpose of the debentures, so-called, and the attitude and intentions with regard to the receipts of the petitioner remained the same after the reorganization of November 1, 1931, as they had been before, namely, that said receipts, whether representing the depletion reserve of the corporation or the profits therefrom, were to be distributed among the descendants of Judge Daniel Dudley Avery in proportion to the stock or debenture holdings of each in the petitioner corporation. We think, on the facts here, that they continued to receive such distributions as the owners of the corporation, and not as its creditors. The relationship here between the petitioner and the debenture-holders is, on the facts *97 substantially different from that of the security-holders and the corporations in ; ; and , which are strongly relied upon by the petitioner to support its case. Further, the facts in the instant case even more obviously support the conclusion reached, if that may be, than those in . The claim that parts of the amounts distributed in each of the taxable years by the petitioner to the holders of its debentures were interest, deductible under section 23 (b), supra, is accordingly denied. In determining the deficiencies in controversy, the respondent allowed depletion deductions computed at the rate of 13.333 cents per ton, which had been agreed upon by the petitioner and the respondent and which had been used for the petitioner's taxable year 1927 and succeeding years. That rate was based on a recoverable salt reserve on March 1, 1913, of 3,750,000 tons, with a basis or value on that date of $500,000. *98 At the hearing, the petitioner produced a witness, who, since 1929, has been employed at petitioner's mine by the operator under the lease thereon, first as assistant manager and since 1932 as manager. As a result of operations and development prior to the end of 1930, he expressed the opinion that the commercially recoverable salt reserve at the close of 1930 amounted to 19,886,992 tons of which 2,873,992 tons were in the level presently being worked, and 5,671,000 tons in each of three lower levels. At the close of the hearing, the respondent moved, and was granted permission, to amend his answer to ask for an increased deficiency based on his erroneous allowance of depletion, during the years in controversy, at a rate computed on an original salt reserve of 3,750,000 tons. The facts being as they are, the depletion allowance for the taxable years in controversy are to be computed by using 19,318,910 tons as the salt reserve at the end of 1936, with a basis or value thereof at that time of $178,108.53. Decisions will be entered under Rule 50. Footnotes
*. The petitioner did not issue fractional shares of stock nor any debentures of less than $100 par value. The owners of the shares and debentures shown as unissued are indicated by a plus sign after the amounts of their shares and debentures shown in the above statement.↩
*. In arriving at this amount, petitioner deducted $3,333.32 as interest paid on its debentures for November and December.↩
*. Includes small amounts representing gain on sale of capital assets and salt, sand and gravel depletion.↩